IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHOSEN 300 MINISTRIES, INC. *et al*., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 12-3159 |
| | : | |
| CITY OF PHILADELPHIA and MAYOR | : | |
| MICHAEL NUTTER, individually and as the | : | |
| Mayor of the City of Philadelphia, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## Findings of Fact & Conclusions of Law

YOHN, J.                                                                    August 9, 2012

Plaintiffs, churches and their leaders, seek a preliminary injunction barring defendants,

the City of Philadelphia (the "City") and Mayor Michael Nutter ("Mayor Nutter"), from

enforcing the Department of Parks and Recreation Regulation Regarding Outdoor Public Serving

of Food ("section 110" or "the ban"), which, with exceptions, bans the distribution of food free

of charge to three or more members of the public within Fairmount Park, and the Regulations of

the Board of Health Concerning: Outdoor Public Serving of Food: Food Safety (the "health

regulations"), which prescribe a food-safety training, permit, and inspection process for groups

engaged in serving food free of charge to three or more members of the public in an outdoor

public space. Plaintiffs, who have conducted outdoor food-sharing programs that serve the

homeless in Fairmount Park for up to two decades, allege that the ban and the health regulations

violate the Pennsylvania Religious Freedom Protection Act, 71 Pa. Stat. Ann. §§ 2401 *et seq*.,

and the free-exercise and free-speech clauses of the First Amendment to the United States Constitution.

I held an evidentiary hearing on July 9 and 10, 2012, and heard argument by counsel on July 12, 2012. Following oral argument, I made preliminary findings of fact from the bench and enjoined the City from enforcing the ban on a temporary basis pending my formal findings of fact and conclusions of law. Having considered all of the testimony and exhibits offered into evidence as well as the parties' written submissions, I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

**I.      Findings of Fact**

      **A.      Background**

1.      Philadelphia has a large homeless population that numbers in the thousands.

2.      The highest concentration of homeless people living on the streets in Philadelphia is along the Benjamin Franklin Parkway (the "Parkway"). Various homeless persons have lived on the Parkway for decades. (Test. of Sister Mary Scullion (July 9, 2012) ("Scullion Test.").)

3.      Defendants do not contest the right of the homeless to live on the Parkway.

4.      The Parkway is a boulevard running through the heart of Philadelphia and is home to many major museums, cultural institutions, and tourist attractions. (Test. of Michael DiBerardinis (July 9, 2012) ("DiBerardinis Test."); Test. of Mayor Michael Nutter (July 10, 2012) ("Nutter Test.").) The green park space that lines the Parkway, which is approximately one block wide, is part of Fairmount Park. (DiBerardinis Test.)

5.      Fairmount Park is a system of 63 municipal parks spanning 9,200 acres that is operated

        by the Philadelphia Department of Parks and Recreation ("Parks Department"). (*Id.*)

6.      There are approximately 25 to 30 groups that offer free food at various times to the

        hungry and homeless along the Parkway. (Pls.' Ex. A, Aff. of Reverend Brian Jenkins

        (May 22, 2012) ("Jenkins Aff.") ¶ 15.) Many of these groups have been engaged in food

        sharing for over ten years. (*Id.*; DiBerardinis Test.)

7.      Plaintiffs are among the religious organizations that conduct outdoor food-sharing

        programs with the homeless along the Parkway, and have done so for many years without

        regulation by the City. (Jenkins Test.)

8.      On March 15, 2012, Mayor Nutter announced a new policy initiative aimed at moving all

        programs that share food with the homeless to indoor locations. (DiBerardinis Test.; Pls.'

        Ex. G.)

9.      Mayor Nutter instructed the Parks Department to issue a regulation that would ban

        outdoor feeding in all City parks. (Pls.' Ex. G at 2.) And the Parks Department did that by

        promulgating section 110, effective June 1, 2012.[1] (DiBerardinis Test.; Pls.' Ex. J.)

10.     As part of the transition process, Mayor Nutter instructed the Commissioner of Public

        Property to establish a temporary food-distribution site on the north side of the City Hall

        apron that will be available for up to one year. (Pls.' Ex. G at 2.)

_____

        [1] Defendants agreed to defer enforcement of this regulation until the conclusion of the
hearing on plaintiffs' motion for a preliminary injunction.

11.    There is no evidence that the regulation or the addition of a temporary food-sharing site at the City Hall apron does anything to accomplish the objective of moving food sharing with the homeless indoors.

12.    With Mayor Nutter's support, the Board of Health, the departmental board of the Philadelphia Department of Public Health, issued regulations establishing a system for food-safety training, permits, and inspection of outdoor food-sharing programs. (Pls.' Exs. G, K.)

**B.    Homelessness in Philadelphia**

13.    A recent study conducted between the hours of midnight and 4 a.m. found between 130 and 160 homeless Philadelphians living on the Parkway. (Scullion Test.)

14.    An earlier case study conducted by the City surveyed 375 homeless individuals living on the Parkway. Of the homeless who participated, 44% had substance-abuse issues, 11% had mental illness, and 34% suffered from both. (Defs.' Ex. D.)

15.    A minority of homeless also suffer from physical disabilities. (Scullion Test.)

16.    During the case study, a majority (69%) of homeless living on the Parkway were encountered at Logan Circle at 19th Street and the Parkway. (Defs.' Ex. D.)

17.    The City spends over $100 million annually to address the needs of the homeless. (Defs.' Ex. F.) Nevertheless, City-run programs that serve the needy are overwhelmed. (Scullion Test.)

18.    The City recently closed the Ridge Avenue Shelter, which provided about 300 to 400 beds for homeless men each night, and has not yet replaced all of these beds. (*Id.*)

4

19.  There are several private indoor facilities that provide food or shelter for the homeless and hungry in Philadelphia. Many of these facilities are overwhelmed and have insufficient resources to accommodate more needy individuals.[2] (*Id.*)

20.  Currently, the Sunday Breakfast Rescue Mission at 13th and Arch Streets has room to accommodate more people at their indoor food-sharing programs. The facility was recently renovated and can now accommodate approximately 250 individuals per meal. The facility serves about 500 meals a day but could serve up to 1000. The facility also has 250 beds for the homeless, about 70 of which are not currently being used. The facility also offers GED assistance, résumé building, and job counseling. Richard McMillen, the executive director of the Sunday Breakfast Rescue Mission, is willing to share the facility with others. (Test. of Richard McMillen (July 10, 2012) ("McMillen Test.").)

21.  Broad Street Ministries, at Pine and Broad Streets, also has additional space to accommodate more individuals for indoor food service but needs additional resources, including food and funding, to expand its food service.[3] (Test. of Susan Kretsge (July 10, 2012) ("Kretsge Test.").)

_____

[2] Mayor Nutter testified that there are currently four private indoor facilities in center city Philadelphia that can accommodate more individuals for indoor food sharing. (Nutter Test.) He testified that he did not know whether these facilities received any funding from the City or whether they provided services other than meals. (*Id.*) Sister Mary Scullion, an expert on homelessness, testified that many of these facilities are overwhelmed and lack resources to accommodate more needy individuals. (Scullion Test.) I find that Sister Mary Scullion is a more credible witness on this issue because she is more intimately acquainted than Mayor Nutter with these facilities and the groups who run them.

[3] With respect to the capability of Sunday Breakfast Rescue Mission and Broad Street Ministries, I credit the testimony of Richard McMillen and Susan Kretsge, respectively. Each testified in greater detail about the capabilities and limitations of these facilities than did Mayor Nutter and Sister Mary Scullion.

22.   Even with the outdoor food-sharing programs on the Parkway and the myriad of services provided by the City, charities, religious groups, and well-meaning citizens, the community of Philadelphia does not currently meet the needs of homeless and hungry Philadelphians. (Scullion Test.)

23.   A state-level budget cut of $160 million for the General Assistance Program took effect on August 1, 2012. This will terminate $200 of monthly assistance for 30,000 single adults in Philadelphia, the anticipated effect of which may be to increase the number of homeless and needy. (*Id.*)

24.   Some homeless are resistant to going to indoor food-service programs. Some homeless do not want to leave their possessions unguarded on the Parkway in order to travel to indoor facilities. Some have physical disabilities that make travel difficult, many have mental disabilities that make it difficult. For example, some homeless have difficulty keeping track of time or place and some have auditory hallucinations that tell them not to go indoors. (Scullion Test.)

25.   Sister Mary Scullion is an expert on homelessness. She received her religious training from the Congregation of the Sisters of Mercy in Merion, Pennsylvania, received a bachelor's degree in psychology from St. Joseph's University and a masters of social work from Temple University. (Pls.' Ex. P.) She has worked with the homeless for over 35 years. (Scullion Test.)

26.   In Sister Mary Scullion's expert opinion, it is possible to work with the homeless over time to get them to come indoors, but the City has not yet committed the resources or preparation necessary to achieve this. (*Id.*)

27.     Defendants desire to feed all of the homeless indoors and argue that there are

organizations capable of doing this. However, many of the homeless resist going indoors.

Defendants need time and a program to persuade those homeless to eat at indoor locations

and there is no evidence at this stage of the litigation that such a program exists.

C.      **Plaintiffs' Religious Activities and Beliefs**[4]

28.     Feeding the poor is central to Christian worship and to other religions as well. (Test. of

Reverend Violet Little (June 9, 2012) ("Little Test."); Test. of Monsignor Arthur Rodgers

(July 9, 2012) ("Rodgers Test.").)

29.     Plaintiffs engage in food sharing with the homeless and hungry on the Parkway as a form

of religious worship. It is their sincere and deeply held belief that they are called by the

teachings of Jesus Christ to share food, comfort, prayer, and fellowship with the poor

where the poor are found. Defendants do not contest the sincerity of plaintiffs' religious

beliefs and purposes.

i.      **Chosen 300 Ministries**

30.     Chosen 300 Ministries, Inc. ("Chosen 300 Ministries"), is a religious organization. (Test.

of Rev. Jenkins (June 9, 2012) ("Jenkins Test.").)

31.     Reverend Brian Jenkins ("Rev. Jenkins") is an ordained minister with the Suburban

Baptists Association of Southeastern Pennsylvania and the executive director of Chosen

300 Ministries. (Jenkins Aff. ¶ 2.)

32.     The mission of the members of Chosen 300 Ministries is to observe their faith by sharing

---

[4] For the sake of uniformity, all citations to the Bible are to the 1769 King James version.
I have done my best to identify, where relevant, the passages that plaintiffs referenced during
their testimony.

7

the Gospel of Jesus Christ and sharing sustenance with the poor, needy, and homeless. (*Id.* ¶ 3.)

33.    The homeless are congregants of Chosen 300 Ministries. Rev. Jenkins performs marriages and baptisms for his homeless congregants. (Jenkins Test.)

34.    Chosen 300 Ministries has been providing free meals to the needy and homeless in Philadelphia since 1996. (Jenkins Aff. ¶ 5.)

35.    Chosen 300 Ministries has operated an outdoor food-sharing program at 16th Street and the Parkway on Saturdays between 4:30 and 6:00 p.m. for more than ten years. Chosen 300 Ministries feeds between 150 and 250 homeless and hungry people at every outdoor service. (Jenkins Test.)

36.    This outdoor food-sharing program begins with a worship service that incorporates prayer, scripture readings, songs, a Gospel message, an invitation to Christian discipleship, and a blessing of the meal. (*Id.*; Jenkins Aff. ¶ 8.) Following this service, Chosen 300 Ministries provides hot meals and non-alcoholic beverages to those who seek to participate. (Jenkins Aff. ¶¶ 8, 10.)

37.    Sharing food in this manner enables the members of Chosen 300 Ministries to meet their religious obligation to provide sustenance to the poor, a critical part of their religious worship. (*Id.* ¶ 4.)

38.    A fundamental tenet of Rev. Jenkins's faith is to serve the poor and needy as if he were serving Jesus Christ.[5] (Jenkins Test.)

---

[5] "And the King shall answer and say unto them, Verily I say unto you, Inasmuch as ye have done it unto one of the least of these my brethren, ye have done it unto me." Matthew 25:40.

39.   Chosen 300 Ministries practices the Christian idea of fellowship by sharing a meal with the homeless and hungry.[6] (*Id.*)

40.   As part of the outdoor program, Chosen 300 Ministries also connects those in need with help obtaining identification, with job-readiness programs, and with computer classes. Chosen 300 Ministries works with City Outreach to engage the homeless and provide them with additional services. (*Id.*)

41.   Members of Chosen 300 Ministries arrive before the outdoor food-sharing program begins in order to clean the area and they clean again after the program has concluded. Since 2003, the City has performed an additional garbage-collection service following the outdoor food-sharing program. (*Id.*)

42.   Chosen 300 Ministries also operates food-sharing programs in Pennsylvania at three indoor locations. (Jenkins Aff. ¶ 5.) While there is some overlap between the individuals who attend the outdoor food-sharing program and the indoor food-sharing programs sponsored by Chosen 300 Ministries, some individuals who attend the outdoor food-sharing program cannot or will not attend the indoor food-sharing programs. (Jenkins Test.)

43.   Chosen 300 Ministries conducts its outdoor food-sharing program at 16th Street and the Parkway because this is an area where the homeless have traditionally congregated. (*Id.*; Jenkins Aff. ¶ 9.) Approximately 10 to 20 homeless people live in this section of the Parkway. Other homeless travel a few blocks from where they live on the Parkway to

---

[6] "He saith unto them, How many loaves have ye? go and see. And when they knew, they say, Five, and two fishes. And he commanded them to make all sit down by companies upon the green grass." Mark 6:38-39.

attend the food-sharing program sponsored by Chosen 300 Ministries. (Jenkins Test.) The location is safe and dignified. (Jenkins Aff. ¶ 9.)

44.    Rev. Jenkins believes that he was called by God to this location, which he believes is God's ground. He believes it is central to the religious worship of Chosen 300 Ministries to be able to meet the homeless where they are. (Jenkins Test.)

45.    This location does not have indoor restroom facilities, hand-washing stations, or portable restrooms, but Chosen 300 Ministries brings hand sanitizer. (*Id*.)

46.    Members of Chosen 300 Ministries will not relocate their outdoor food-sharing program to the City Hall apron because it would violate their central religious beliefs. Rev. Jenkins will not relocate to the City Hall apron because he believes that he was called by God to the Parkway and that God has not directed him to relocate. (*Id*.)

47.    Chosen 300 Ministries complies with the health regulations.  These regulations are not a burden on Chosen 300 Ministries. (*Id*.)

        **ii.    The Welcome Church**

48.    The Welcome Church is a church without walls serving people experiencing homelessness. (Pls.' Ex. B, Aff. of Reverend Violet Little (May 29, 2012) ("Little Aff.") ¶ 2). The Welcome Church is a recognized parish with tax-exempt status and a congregation identification number with the Evangelical Lutheran Church in America ("ELCA"). (Little Test.)

49.    Reverend Violet Little ("Rev. Little") is an ordained minister of the ELCA, a psychotherapist, and the pastor of the Welcome Church. (*Id*.; Little Aff. ¶ 2.)

10

50.     The purpose of the Welcome Church is to provide hope and fellowship, and to build

        relationships between congregants. The Welcome Church strives to nourish the body and

        the spirit. (Little Test.)

51.     The hungry and the homeless are Rev. Little's congregation. (*Id.*)

52.     The Welcome Church conducts an outdoor food-sharing program on the last Sunday of

        every month at 3:00 p.m. in the park in front of the Philadelphia Family Court at 18th

        Street and the Parkway. (*Id.*)

53.     Rev. Little has known some of her congregants for over seven years, but there are often

        new visitors at each food-sharing program. (*Id.*)

54.     The Welcome Church conducts services on the Parkway because that is where the

        homeless are and because there are some homeless who can only be reached in their own

        context. (*Id.*) The Welcome Church considers this location sacred ground for prayer and

        communion because it is in nature and because it is where the homeless live. (Little Aff.

        ¶ 6.)

55.     Rev. Little arrives an hour or two before each service to clean the grounds. (Little Test.)

56.     The Welcome Church begins the food-sharing program with a worship service consisting

        of prayer, scripture readings, songs, a Gospel message, and Communion, which is the

        sharing of sacramental bread and grape juice that represent the body and blood of Christ,

        after which members share light refreshments such as pastries and coffee. (*Id.*; Little Aff.

        ¶ 8.) Provision of food to the needy is an extension of the church's Communion service

        and is an ongoing representation of the Communion observed during the service. (Little

        Aff. ¶ 6.)

57.  The Welcome Church brings trash bags and gloves to clean the park again after the service. (Little Test.)

58.  The Welcome Church is a church without walls in two respects. The church conducts its worship program outdoors on the Parkway, which it considers sacred ground, away from physical walls. Additionally, the Welcome Church is a church without social walls that separate the homeless and mentally ill from other members of society. It is important to the mission of the church that the housed and the homeless integrate to worship and eat together. (*Id*.)

59.  Developing relationships with the homeless and hungry is necessary in order to connect the homeless with social services beyond meals. The Welcome Church helps homeless individuals obtain housing, clothing, blankets, and mental-health services, and helps them to enter drug- and alcohol-rehabilitation programs. (*Id*.; Little Aff. ¶ 11.)

60.  Sharing food with the homeless and hungry is a central expression of Rev. Little's faith and is fundamental to her religious work as a pastor. She seeks to follow the example of Jesus Christ.[7] (Little Test.)

61.  The outdoor food-sharing program allows members of the Welcome Church to meet their religious obligation to provide sustenance to the poor, which is a critical part of their religious worship. (Little Aff. ¶ 4.)

62.  The Welcome Church has access to indoor space donated by other facilities and conducts a food-sharing program indoors at Arch Street United Methodist Church at Broad and

---

[7] See "the feeding of the 4,000" at Mark 8:1-9 and Matthew 15:32-38 and "the feeding of the 5,000" at Matthew 14:14-23, Mark 6:33-44, Luke 9:11-17, and John 6:5-13.

Arch Streets on Mondays between 1:00 and 2:30 p.m. (*Id.* ¶ 5.)

63. There is some overlap between the congregants who attend the indoor program and those who attend the outdoor program, but the programs serve different needs. Some individuals who come to the outdoor program will not attend any indoor programs for a variety of reasons including mental illness, antisocial personality disorder, anxiety, or shame. (Little Test.)

64. Some of the Welcome Church's congregation will not come to the City Hall apron and others cannot come because of disabilities such as amputated toes or cellulitis. (*Id.*)

65. If banned from conducting their worship and food-sharing program on the Parkway, the congregation of the Welcome Church will be severely altered or eliminated. (*Id.*)

66. Rev. Little has completed food-safety training and the Welcome Church has complied with and will continue to comply with the health regulations. (*Id.*)

### iii.    The King's Jubilee

67. The King's Jubilee is a ministry of the Pan Orthodox Church. (Pls.' Ex. C, Aff. of Reverend Cranford Coulter (May 24, 2012) ("Coulter Aff.") ¶ 2.)

68. Reverend Cranford Coulter ("Rev. Coulter") is the director of the King's Jubilee. (*Id.*)

69. Rev. Coulter has been serving among the homeless for 25 years, and he established the King's Jubilee 23 years ago. (Test. of Rev. Cranford Coulter (July 9, 2012) ("Coulter Test.").)

70. The homeless are part of Rev. Coulter's congregation. (*Id.*)

71. The King's Jubilee conducts an outdoor food-sharing program every Thursday at the park in front of the Philadelphia Family Court at 18th Street and the Parkway between 8:00

and 9:30 p.m. (*Id.*; Coulter Aff. ¶ 5.)

72.     Members of the church clean the park before the program begins. (Coulter Test.)

73.     The food-sharing program begins with a prayer and then hot food and non-alcoholic
        drinks are served buffet style. After the meal, the King's Jubilee offers another prayer and
        religious counseling for those who desire it. (Coulter Aff. ¶¶ 5, 8.)

74.     The program also provides those in need with clothing, shoes, toiletries, and cleaning
        supplies. (*Id.* ¶ 9.)

75.     Members of the King's Jubilee observe their faith by providing sustenance to the poor,
        needy, and homeless.[8] They believe that this is their religious obligation. They seek to
        replicate the acts of Jesus Christ by providing food to the needy where the needy are
        found. (*Id.* ¶¶ 4-5.)

76.     The King's Jubilee believes that the needy and homeless sanctify the ground where they
        live and the ground where the outdoor food-sharing program is held. (*Id.* ¶ 5.) The King's
        Jubilee will follow the homeless. The church is not wed to a particular physical location,
        only to where the homeless are. (Coulter Test.)

77.     Rev. Coulter's congregants believe that Mayor Nutter is ashamed of them and is trying to
        hide them. They are hurt by the City's actions, so they will not go to the City Hall apron.
        (*Id.*)

78.     Members of the King's Jubilee work during the day and Rev. Coulter testified that they

---

[8] "Even so faith, if it hath not works, is dead, being alone. Yea, a man may say, Thou hast
faith, and I have works: shew me thy faith without thy works, and I will shew thee my faith by
my works." James 2:17-18.

cannot conduct their food-sharing program during the hours the City has made the City Hall apron available. (*Id.*)

79.     Some of the homeless do not like or have been sickened by food at City-run shelters and will not go indoors. (Coulter Aff. ¶ 11.)

80.     Some of the congregants of the King's Jubilee are not homeless, but are hungry. They will not go to indoor food-sharing programs because they do not want to take services away from the homeless. (Coulter Test.)

81.     Serving outdoors allows the King's Jubilee to reach people for Christ whom they cannot reach indoors. (Coulter Aff. ¶ 7.)

82.     The King's Jubilee complies with the health regulations in serving food and will continue to do so. However, Rev. Coulter's Bishop will not allow him to apply for a permit, as it violates the philosophy of their church. (Coulter Test.)

            **iv.     Philly Restart**

83.     Philly Restart is a Christian nonprofit organization. (Pls.' Ex. D, Aff. of Adam Bruckner (May 23, 2012) ("Bruckner Aff.") ¶ 5; Test. of Adam Bruckner (July 10, 2012) ("Bruckner Test.").)

84.     Adam Bruckner is a licensed minister. He experienced a religious awakening approximately ten years ago. Bruckner founded Philly Restart in 2002 in response to what he believes is the call of the Bible to love the poor and live his faith. (Bruckner Aff. ¶¶ 3, 5; Bruckner Test.)

85.     Philly Restart conducts an outdoor food-sharing program on Mondays between 4:00 and 5:30 p.m. at the park in front of the Philadelphia Family Court at 18th Street and the

Parkway. (Bruckner Aff. ¶ 8.) During the summer, the program serves approximately 250 people and during the winter it serves between 70 and 100 people. (Bruckner Test.)

86.   The program begins with a prayer and announcements to the congregation, then hot food and non-alcoholic beverages are served and another prayer is held. (*Id*.; Bruckner Aff. ¶ 8.)

87.   The religious purpose of this program is to "Love thy neighbor as thyself."[9] (Bruckner Aff. ¶ 5.)

88.   Bruckner observes his religious beliefs and engages in religious worship by providing food to the poor and homeless. (*Id*. ¶ 6.)

89.   Philly Restart conducts its program on the Parkway because it is an area where the homeless have congregated traditionally, and because the area is safe, dignified, and centrally located. (*Id*. ¶ 9.)

90.   The Free Library, located a block down the Parkway, is the focal point of the homeless on the Parkway because it admirably provides safe, climate-controlled restrooms and computers that they can use to apply for jobs. (Bruckner Test.)

91.   In addition to offering food, Philly Restart offers help to the homeless with securing photo identification and birth certificates, which are necessary to obtain employment and government benefits, to secure housing, and to cash checks. There is no governmental organization that offers this kind of service, and Philly Restart is the only private organization that provides this assistance. Shelters, rehabilitation facilities, City Hall, and even the Mayor's Office refer individuals to Philly Restart for this service. (*Id*.)

---

[9] Matthew 19:19.

92.     Bruckner cannot relocate to City Hall because he serves at 4:00 p.m. and the City Hall apron is not open at that time for outdoor food-sharing programs. Bruckner works nights and cannot conduct his program between 6:00 and 8:00 p.m. when the City Hall apron is open. (Bruckner Test.)

93.     Many people who attend the program attend regularly, but strangers are always welcome. (*Id*.)

94.     Philly Restart has not missed a day of service in over ten years and is a source of consistency to many who have little consistency in their lives. Bruckner believes that relocating to the City Hall apron would undermine this stability. (*Id*.)

95.     Members of Philly Restart will not relocate to City Hall because the homeless have asked them not to. There are homeless individuals who attend Philly Restart's outdoor service who will not go indoors.  (*Id*.)

96.     Philly Restart complies with the health regulations. Bruckner has not attended the food-safety training offered by the City but several of his volunteers have and he is willing to attend if need be. (Bruckner Aff. ¶ 7.)

        **D.     Shift in City Policy**

97.     Mayor Nutter has been the mayor of the City of Philadelphia for the last four and a half years. He has been involved in City politics in some capacity since 1982. (Nutter Test.)

98.     The food-sharing programs conducted along the Parkway have been a concern to City government for more than ten years, and have been a concern of more than one mayoral administration. (*Id*.; Defs.' Exs. A, B.)

17

99.    On March 15, 2012, Mayor Nutter announced a policy initiative aimed at moving all

programs that share food with the homeless and hungry to indoor locations. (DiBerardinis

Test.; Pls.' Ex. G.)

100.   The stated purposes of this policy are to increase health, dignity, and support for the

homeless and hungry. (DiBerardinis Test.; Pls.' Ex. G.)

101.   Mayor Nutter instructed the Parks Department to issue a regulation that would ban

outdoor feeding in all City parks. (Pls.' Ex. G at 2.)

### i.    Parks Department Regulation

102.   The mission of the Parks Department is to maintain and steward public land and provide

high-quality programs to the public. (DiBerardinis Test.)

103.   The Parks Department cleans and maintains Fairmount Park and regulates organized

events on the Parkway. (*Id*.)

104.   Most of the open green space in Philadelphia is part of Fairmount Park, and there is no

open green space on or around the Parkway that is not a part of Fairmount Park. (*Id*.)

105.   The City operates two cafés along the Parkway, Café Cret at 16th Street and the Parkway,

which has outdoor seating, and Milk and Honey Café at 18th Street and the Parkway.

(Jenkins Test.; Nutter Test.)

106.   Approximately four or five carts that serve food operate along the Parkway. Lines of 30

to 50 people can form in front of these carts as patrons wait to purchase their food.

(Jenkins Test.)

107.   Visitors to the food carts and the cafés often eat their food outdoors along the Parkway.

(DiBerardinis Test.)

18

108.    Museum-goers, tourists, picnickers, families, and the homeless all enjoy the open green spaces along the Parkway. (*Id.*)

109.    The City, in general, has a trash and litter problem, and Fairmount Park is no exception. (*Id.*)

110.    The City collects approximately 731,000 tons of solid waste every year and trash along the Parkway accounts for only a small fraction of that. (*Id.*; Pls.' Ex. L.)

111.    Special events, picnicking families, tourists, and the homeless all contribute to the litter on the Parkway. (DiBerardinis Test.)

112.    Occasional human waste along the Parkway is also a concern. (*Id.*)

113.    While some outdoor food-sharing programs clean up after their service, not all do. Also, some homeless wander off with the food they receive from outdoor food-sharing programs and eat on the steps of the Cathedral Basilica of Saints Peter and Paul, located at 17th Street and the Parkway. They block access to the church and leaving trash strewn about the steps and behind the bushes. As a result, the church removed the bushes. (Rodgers Test.)

114.    Outdoor food-sharing programs add to the maintenance demands along the Parkway by contributing to an increase in trash, litter, and rodents, and to occasional human excrement. This requires extra staff, particularly on the weekends. (Test. of Christopher Palmer (July 10, 2012).)

115.    The Commissioner of the Department of Parks and Recreation, Michael DiBerardinis, believes that the trash generated by these programs diminishes others' enjoyment of the

parks, deteriorates the landscape, and affects the operations, manpower, and resources of the Parks Department. (DiBerardinis Test.)

116.   While the City has begun installing trash compactors around Philadelphia to address the litter problem, Commissioner DiBerardinis has not asked for them to be installed in Fairmount Park. (*Id.*)

117.   At Mayor Nutter's direction, the regulations governing Fairmount Park were amended to add section 110, effective June 1, 2012, which states:

> (1) No person, group, or organization may engage in Outdoor Public Serving of Food anywhere in the Fairmount Park system.

> (2) For purposes of this regulation, "Outdoor Public Serving of Food" means the distribution of food free of charge to the public, to groups of three or more people. "Outdoor Public Serving of Food" does not include (A) the distribution of food as part of a special event recognized by the Managing Director's Office pursuant to the Mayor's Special Event Policy or a permit of the Department of Parks and Recreation; or (B) a special event sponsored by a City agency.

(*Id.*; Pls.' Ex. J.)

118.   The purpose of section 110 is to reduce trash, litter, and human waste generated by outdoor food-sharing programs. (DiBerardinis Test.)

119.   The City interprets this regulation to ban the outdoor distribution of free food to three or more members of the public. (*Id.*)

120.   The City interprets the word "public" to mean strangers or persons unknown to the provider. (*Id.*)

121.   Defendants do not consider a person to be offering food to members of the public, within the meaning of the regulation, if he or she is providing food to a known group such as

20

family members, classrooms of children, a Girl Scout troop, or potluck picnics, so long as the known group has a relationship that extends beyond sharing food outdoors. (Pls.' Ex. V, Dep. of Dr. Donald F. Schwarz (June 29, 2012) ("Schwarz Dep.").)

122.   Mayor Nutter believes the ban on sharing food outdoors in Fairmount Park is justified because he thinks that it is undignified to make the hungry and homeless wait in line for food.  (Pls.' Ex. G at 1.)

123.   Mayor Nutter is aware that the homeless and hungry have to wait in lines outside indoor food-sharing facilities. (Nutter Test.) He is also aware that individuals wait in lines outside of food carts along the Parkway to purchase food. (*Id*.) Furthermore, food sharing at the City Hall apron also requires the homeless and hungry to wait in lines for food. (Test. of James Mather (July 10, 2012) ("Mather Test.").)

124.   Mayor Nutter would like all food-sharing programs to be conducted indoors, in a space with running water, restrooms, and climate control. And he would like to accomplish this goal within a year. (Nutter Test.)

125.   The Free Library currently provides the homeless access to running water and indoor restrooms in a climate-controlled environment on the Parkway. (Bruckner Test.)

126.   As mentioned above, some homeless are resistant to going indoors for food-service programs. And while it may be possible to work with these homeless over time to get them to come indoors, the City has not committed the resources or preparation necessary to achieve this. (Scullion Test.)

127.   Furthermore, some homeless are physically disabled and cannot travel to the indoor facilities. (*Id*.) The City has offered no explanation or plan for how these disabled homeless are to be transported to the indoor facilities.

128.   Those homeless and hungry who cannot or will not enter indoor facilities will suffer extreme hunger and may resort to panhandling or trash picking if outdoor food-sharing programs in Fairmount Park cease operating. (Jenkins Aff. ¶ 12; Little Aff. ¶ 12; Bruckner Aff. ¶ 15.)

129.   Mayor Nutter believes that the homeless need more than just meals and that the City would have an opportunity to provide mental-health counseling, dependency counseling, and other services at an indoor facility. (Nutter Test.)

130.   Mayor Nutter admits that he does not know whether indoor facilities offer such services. (*Id*.)

131.   Mayor Nutter offered no explanation as to why the City could not offer these services to the homeless and needy on the Parkway. (*Id*.)

132.   Mayor Nutter is aware that the groups that conduct outdoor food-sharing programs on the Parkway also provide services other than food. And he is aware that Philly Restart offers a unique service that no other group in Philadelphia provides. Mayor Nutter also appreciates the importance of developing relationships with the homeless in order to be able to connect them to social services, a challenge for many City employees and City-run programs. (*Id*.)

133.   In Sister Mary Scullion's expert opinion, the ban will not advance the interests of the homeless but will instead have a devastating impact on them. Sister Mary Scullion

supports Mayor Nutter's goals of ending homelessness and working with the homeless to bring them indoors for meals, but she feels that there need to be viable alternatives offered before the ban goes into effect and that no such alternatives exist currently. Without any present alternatives, she does not support the ban. (*Id.*)

### ii.    The City Hall Apron

134.    Mayor Nutter instructed the Commissioner of Public Property to establish a temporary food-distribution site on the north side of the City Hall apron, that will be available for up to one year as a transition space. (Pls.' Ex. G at 2.)

135.    The City Hall apron is open to food-sharing programs between 6:00 and 8:00 p.m. seven days per week, and is open between 11:00 a.m. and 2:00 p.m. on Saturdays and Sundays. (Defs.' Ex. 6.)

136.    Food-sharing programs that wish to use the City Hall apron must sign up for one of these times with the Department of Public Property. (Pls.' Ex. G at 2.) Currently, more groups can be accommodated at the City Hall apron. (Kretsge Test.; Defs.' Ex. 6.)

137.    The City provides temporary hand-washing stations, portable restrooms, and security at the City Hall apron during food-service programs. (Kretsge Test.)

138.    There are four lanes of traffic surrounding City Hall on all sides. Traffic around City Hall is very heavy, especially during rush hour, which overlaps substantially with the times when the space is available for food-service programs. (Coulter Test.; Mather Test.) The traffic makes the City Hall apron space very noisy. (Coulter Aff. ¶ 13; Little Aff. ¶ 15.)

139.    The intersections leading to City Hall are considerably harder to cross than intersections along the Parkway. (Coulter Test.; Mather Test.)

23

140.    The City Hall apron is an entirely concrete space that is considerably smaller and more

confining than the green spaces along the Parkway. (Scullion Test.)

141.    The City Hall apron is adjacent to a large construction site where dirt, dust, debris, and

slabs of broken concrete abound. (Jenkins Test.; Mather Test.) As a result, the City Hall

apron space is dirty and dusty. (Coulter Aff. ¶ 13; Little Aff. ¶ 15.) Rev. Jenkins believes

that the space is not suitable for serving food because of the dust blowing off of the

construction site. (Jenkins Test.)

142.    Some homeless and hungry will come to the City Hall apron and some will not. (Scullion

Test.)

143.    Security makes some of the homeless feel uncomfortable and discourages them from

attending outdoor food-sharing programs at the City Hall apron. (Jenkins Test.) Many of

the homeless are afraid of governmental officials and police officers and will not go near

City Hall or the Criminal Justice Center. (Bruckner Aff. ¶ 15; Coulter Aff. ¶ 13; Little

Aff. ¶ 15.) Some of the homeless may themselves become unsafe if they feel

uncomfortable and may make the City Hall apron location unsafe. (Jenkins Test.)

144.    Feeding 5000 is a religious organization that conducted an outdoor food-sharing program

at the park in front of the Philadelphia Family Court at 18th Street and the Parkway on

approximately 15 to 20 Sundays per year before the ban. The food-sharing program,

which had a religious component, served about 175 homeless and hungry individuals

each time. The act of sharing food with the homeless is central to the religious observance

Case 2:12-cv-03159-WY   Document 27   Filed 08/09/12   Page 25 of 55

of Feeding 5000.[10] The homeless are congregants of Feeding 5000. After the meal was served, the homeless would stay and form relationships with volunteers from Feeding 5000. These relationships help the volunteers pass along information and services to the homeless. Feeding 5000 also provides clothing to those in need and helps find housing for the homeless. (Mather Test.)

145.   Following the ban, Feeding 5000 relocated its outdoor food-sharing program to the City Hall apron. Since relocating, the congregation of Feeding 5000 has decreased in size by more than half. Feeding 5000 now serves between 75 and 80 people. Additionally, members of Feeding 5000 are losing relationships with the homeless congregants who do still attend because many of the homeless take their food and leave, or leave immediately after finishing their food. This has undermined the ability of Feeding 5000 to deliver social services to the congregation. (*Id.*)

146.   James Mather, the executive director of Feeding 5000, believes that his congregants are not coming to the City Hall apron for several reasons: some of them cannot physically travel that far or cannot cross four lanes of traffic, some do not like the security guards in attendance, some have been gawked at by people passing by and have had their picture taken, and some do not like the construction and the dust that it produces. (*Id.*)

147.   The City has provided three security guards and one maintenance person at the City Hall apron each time Feeding 5000 has conducted a program there. The City has not provided

---

[10] "For I was an hungred, and ye gave me meat: I was thirsty, and ye gave me drink: I was a stranger, and ye took me in: Naked, and ye clothed me: I was sick, and ye visited me: I was in prison, and ye came unto me." Matthew 25:35-36.

any additional social services or outreach at these programs. (*Id.*)

148. Mayor Nutter believes that the City Hall apron space is a suitable transition space because centralizing all of the outdoor food-sharing programs in one place will facilitate moving the programs indoors. He offered no explanation for why the transition could not be facilitated on the Parkway. (Nutter Test.)

149. Mayor Nutter also believes that centralizing the programs will decrease the impact on the Parks Department and allow the non-homeless to enjoy the Parkway more. He admits that this merely shifts the trash and maintenance burden from the Parkway to City Hall. (*Id.*)

150. The City plans to offer services beyond just meals to the homeless and hungry at the City Hall apron. Mayor Nutter acknowledges that the City could provide portable restrooms at the locations on the Parkway where outdoor-food sharing programs are conducted. (*Id.*)

151. Mayor Nutter intends to close the City Hall apron space in the future, and to ban outdoor food-sharing programs at City Hall also. (*Id.*)

152. Those homeless and hungry who cannot or will not attend outdoor food-sharing programs at the City Hall apron will suffer extreme hunger and may resort to panhandling or trash picking if outdoor food sharing in Fairmount Park ends. (Bruckner Aff. ¶ 15; Jenkins Aff. ¶ 12; Little Aff. ¶ 12.)

### iii.   Department of Health Regulations

153. The City has a highly developed regulatory system to ensure that food that is sold to the public is safe. The Department of Health educates and inspects over 12,000 food establishments throughout the City annually. (Pls.' Ex. K at 3.) But the City has not previously educated or inspected programs that provide food free of charge to those who

are not able to purchase it. (*Id*. at 4.)

154.   Approximately 1 in 6 people, 28 million people in total, experience food poisoning

annually in the United States. Most recover without any long-term health effects.

However, serious side effects can include kidney failure, chronic arthritis, brain damage,

nerve damage, and death.  (*Id*. at 2.)

155.   The homeless are more susceptible to food-borne illness because of higher rates of

malnutrition, alcoholism, and chronic illness such as diabetes. The risk of food-borne

infection is 18 times higher in alcoholics and 25 times higher in diabetics than in healthy

individuals. (*Id*. at 2.)

156.   There have been no reported incidents of food-borne illness from outdoor food-sharing

programs on the Parkway. (Nutter Test; Pls.' Ex. K at 1.) Most of the programs providing

food on the Parkway already meet appropriate health and safety standards. (Schwarz

Dep.)

157.   Food-borne illnesses are commonly underreported and the Health Department does not

wait until a report of such illness to regulate food safety. (Pls.' Ex. K at 1.)

158.   In March 2012, the Board of Health, with Mayor Nutter's support, promulgated

regulations affecting outdoor food-sharing programs. (Pls.' Exs. G, K.)

159.   These regulations prohibit the outdoor public serving of food unless an annual "Outdoor

Public Serving of Food: Food Safety Permit" is obtained from the Department of Public

Health in advance and the permit is posted at the food-service site during the service. The

regulations require at least one person serving food to complete a free two-hour food-

safety course and pass a test at the end of the course. The regulations also require servers

27

to wear gloves and to comply with certain food preparation and transportation

requirements. The food-sharing programs must provide temporary hand-washing stations

unless only pre-packaged food is distributed, in which case hand wipes or hand sanitizer

are sufficient.[11] (Pls.' Ex. K.)

_____

[11] The regulations provide:

      SECTION 1. No person, group, or organization shall engage in Outdoor Public Serving of Food, except as provided in Sections 2 and 3. For purposes of this regulation, "Outdoor Public Serving of Food" means the distribution of food free of charge to members of the public, in groups of three or more people, on any public highway, on any public sidewalk, or in any outdoor public place; except that "Outdoor Public Serving of Food" shall not include the distribution of food as part of a special event recognized by the Managing Director's Office pursuant to the Mayor's Special Event Policy (Executive Order 6-93) or a permit of the Department of Parks and Recreation; a special event sponsored by a City agency; the distribution of pre-packaged food as part of a time-limited promotional campaign by a commercial entity; or an unplanned, non-recurring distribution of food.

      SECTION 2. Any person, group, or organization engaging in outdoor public serving of food is required to obtain an annual Outdoor Public Serving of Food: Food Safety Permit in advance from the Department of Public Health. The Department shall issue a permit to any person, group, or organization who submits all of the following on a form acceptable to the Department: . . .

      SECTION 3. No person, group or organization shall engage in outdoor public serving of food unless:
      (a) The person, group or organization responsible for the operation posts prominently at the food service site during all hours of operation an Outdoor Public Serving of Food: Food Safety Permit provided by the Department. The permit shall set forth Department contact information for patrons to report potential food-borne illness and/or concern about food safety.
      (b) The food service activity takes place at a day, time and place identified pursuant to Section 2(b) above.
      (c) Food distribution is limited to the types of food identified pursuant to Section 2(c) above.
      (d) All food either:
            (.1) Is prepared at the facility identified pursuant to Section 2(d)

160.    The Health Department regulations do not address the time or place of outdoor food

service and do not prohibit food service in Fairmount Park or anywhere else in the City.

(*Id*. at 9.)

161.    There is no fee for the permit application or the safety-training course. (*Id*. at 4.)

162.    In order to comply with the hand-washing provisions, a group need only purchase an urn

or a cooler that water can flow out of—running hot and cold water are not required. The

Health Department estimates that such containers can be purchased for approximately

$20.00. (Schwarz Dep.)

163.    The Health Department expects to process permit applications within 10 days but

processing may take as long as 3 weeks. (Pls.' Ex. K at 6.)

164.    The regulations are intended to prevent the spread of food-borne illness through outdoor

---

above and such facility retains its Public Health approval; or
(.2) Is prepared in accordance with the requirements of subsection
(A) below, in a kitchen that meets or contains all of the
requirements set forth in Subsection (B) below: . . .

(e) A person who has completed the Department's Outdoor Public Service
of Food: Food Safety Course, or an equivalent course approved by the
Department, is on site during the entirety of any food service.

(f) No person involved in the preparation, serving or distribution of food
engages in any bare hand contact with any ready-to-eat food.

(g) Temporary hand washing is available at the food service site, except
that, where only  pre-packaged food is handled or distributed, hand wipes
or hand sanitizer shall be sufficient.

(h) All persons involved in the preparation, serving or distribution of food
properly wash their hands prior to food handling and between glove
changes.

(i) All foods are completely protected from contamination during
transportation, preparation, display, and service.

(j) All food is transported and served at the proper temperature.

(Pls.' Ex. K.)

food-sharing programs. (*Id*. at 4.)

165.   The permit system is intended to help the Health Department trace the spread of food-borne illnesses if it should occur. (Nutter Test.)

166.   So far, 34 individuals have taken the food-safety course and all have passed the test at the end of the training. (Kretsge Test.; Defs.' Ex. 3.)

167.   Thirteen groups have applied for the outdoor food-sharing permit and 12 have been approved. The group that was denied had not yet had a member complete the food-safety course. (Defs.' Ex. 4.)

168.   After receiving the permit, 10 groups also completed a separate application to serve food at the City Hall apron, and all 10 have been approved. (*Id*.)

169.   James Mather obtained a permit from the Health Department to serve food outdoors at City Hall. It took about two weeks to complete the entire process. He was treated well by the Health Department. (Mather Test.)

## II.   Conclusions of Law

1.   Plaintiffs allege that the regulations of the Parks Department and Health Department pertaining to outdoor food sharing violate the Pennsylvania Religious Freedom Protection Act ("PRFPA"), 71 Pa. Stat. Ann. §§ 2401 *et seq*., and the free-exercise and free-speech clauses of the First Amendment to the United States Constitution. They seek a preliminary injunction barring defendants from enforcing these regulations.

2.   As a preliminary matter, I note that "[a] fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S.

439, 445 (1988). Because I conclude that plaintiffs are reasonably likely to prevail on their claim that section 110 violates the PRFPA and that plaintiffs have established the other requisites necessary to obtain a preliminary injunction against the ban, an adjudication of the constitutional questions with respect to the ban is unnecessary and inappropriate at this early stage in the litigation.[12] *Id.* My analysis of the ban thus begins and ends with the PRFPA issue.

### A.      Preliminary Injunction Standard

3.      To obtain a preliminary injunction, plaintiffs must establish: (1) "that they are reasonably likely to prevail eventually in the litigation[;]" (2) "that they are likely to suffer irreparable injury without relief[;]" (3) that granting relief would not harm the defendants more than denying relief would harm the plaintiffs; and (4) that "granting relief would serve the public interest." *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002).

---

[12] Nor do I reach the merits of plaintiffs' argument that the health regulations violate the PRFPA and the free-exercise and free-speech clauses of the First Amendment. I need not adjudicate these claims for two reasons. First, plaintiffs have arguably abandoned them. Plaintiffs testified that they are currently complying with the health regulations and will continue to comply with them. At oral argument, counsel for plaintiffs explained that plaintiffs' real quarrel is not with the health regulations, but with the ban. However, because the language in the health regulations that define the "outdoor public serving of food" mirrors that of the ban, plaintiffs have challenged the health regulations so as not to jeopardize their claims concerning the ban. While there is some overlap in language between the Health Department regulations and the Parks Department regulation, each regulation serves different purposes by drastically different means. Having explained to plaintiffs that I consider these regulations to be legally distinct, I understand plaintiffs' last position to be that they do not quarrel with the heath regulations.

Second, as discussed in greater detail at footnote 19 *infra*, plaintiffs have failed to show that the health regulations will cause them irreparable injury and I will deny their motion for a preliminary injunction with respect to the health regulations accordingly.

### B.      Likelihood of Success on the Merits of the PRFPA Claim

4.      The Pennsylvania Religious Freedom Protection Act "was enacted in order to provide

more protection to the exercise of religious beliefs than that currently afforded by the Free

Exercise Clause of the First Amendment to the Federal Constitution."[13] *Brown v. City of*

*Pittsburgh*, 586 F.3d 263, 285 (3d Cir. 2009).

5.      The PRFPA prohibits a municipal agency from "substantially burden[ing] a person's free

exercise of religion, including any burden which results from a rule of general

applicability," except where "the agency proves, by a preponderance of the evidence, that

the burden is" both "[i]n furtherance of a compelling interest of the agency" and "[t]he

least restrictive means of furthering the compelling interest." 71 Pa. Stat. Ann. § 2404.

6.      "Free exercise of religion" is defined under the statute as "the practice or observance of

religion under Section 3 of Article I of the Constitution of Pennsylvania," *id*. § 2403,

which in turn provides that "[a]ll men have a natural and indefeasible right to worship

Almighty God according to the dictates of their own consciences; no man can of right be

compelled to attend, erect or support any place of worship, or to maintain any ministry

against his consent; no human authority can, in any case whatever, control or interfere

with the rights of conscience, and no preference shall ever be given by law to any

religious establishments or modes of worship," Pa. Const. art. I, § 3.

7.      The PRFPA defines a "substantial burden" as "an agency action which does any of the

following: (1) Significantly constrains or inhibits conduct or expression mandated by a

---

[13] For a full discussion of the history of federal First Amendment jurisprudence and its influence on the PRFPA see *Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 260-61 (3d Cir. 2008) (Scirica, C.J., concurring).

32

person's sincerely held religious beliefs. (2) Significantly curtails a person's ability to express adherence to the person's religious faith. (3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion. (4) Compels conduct or expression which violates a specific tenet of a person's religious faith." 71 Pa. Stat. Ann. § 2403. Here, plaintiffs argue that the ban constitutes a substantial burden under subsections (1), (2), or (3).

8.   Plaintiffs bear the initial burden of proving "by clear and convincing evidence that their free exercise of religion has been burdened or likely will be burdened in violation of § 2404." *Combs*, 540 F.3d at 252 (per curiam) (internal quotation marks and alterations omitted); *see* § 2405(f); *see also In re Sylvester*, 555 A.2d 1202, 1203-04 (Pa. 1989) (defining the clear and convincing standard as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue"). If plaintiffs carry their burden, defendants "are required to prove, by a preponderance of the evidence, that [the challenged action] furthers a compelling interest and is the least restrictive means of furthering the interest." *Combs*, 540 F.3d at 252-53 (per curiam); *see* § 2404(b).

### i.   Free Exercise of Religion

9.   Plaintiffs' practice of sharing food with the homeless and hungry is religious activity as defined by the PRFPA.

10.  It is plaintiffs' sincere belief, which defendants do not contest, that they have a religious obligation to provide sustenance to the poor and needy. (Bruckner Aff. ¶ 3; Coulter Aff. ¶ 4; Jenkins Aff. ¶¶ 3-4; Little Aff. ¶ 4; Defs. City of Phila.'s and Michael A. Nutter's Post-

Hearing Br. ("Defs.' Post-Hearing Br.") at 3 ("We understand that the service of meals furthers plaintiffs' religious mission to feed the hungry, and we do not quarrel with their contention that this is a sincere religious practice and belief.").)

11.    Plaintiffs are not unique in this respect. Acts of charity are central to Christian worship. (Little Test.; Rodgers Test.); *see also Jesus Ctr. v. Farmington Hills Zoning Bd. of Appeals*, 215 Mich. App. 54, 64-65 (Mich. Ct. App. 1996) ("The Bible . . . is replete with passages teaching that the God of the Bible is especially concerned about the poor, that believers must also love the poor, and that this love should result in concrete actions to deal with the needs of the poor.") (internal footnotes omitted).

12.    Indeed, "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions." *W. Presbyterian Church v. Bd. of Zoning Adjustment*, 862 F. Supp. 538, 544 (D.D.C. 1994) (examining the teachings of Islam, Hinduism, and Judaism with respect to charitable acts).

13.    Plaintiffs fulfill this religious obligation by conducting outdoor food-sharing programs with the homeless in Fairmount Park. (Bruckner Aff. ¶ 3; Coulter Aff. ¶ 4; Jenkins Aff. ¶¶ 3-4; Little Aff. ¶ 4.)

14.    Plaintiffs' food-sharing programs each contain a different combination of religious components such as prayers, blessings, songs, Gospel messages, Gospel readings, invitations to discipleship, religious counseling, and the sacrament of Communion. (Bruckner Test.; Coulter Test.; Jenkins Test.; Little Test.)

15.    Sharing food with the homeless is not merely incidental to plaintiffs' religious activities in Fairmount Park. To plaintiffs, the act of sharing food is itself an act of worship. For

example, the members of Chosen 300 Ministries "observe . . . [their] faith . . . through acts of providing sustenance to the poor, needy, and homeless." (Jenkins Aff. ¶ 3.) For members of the Welcome Church, "provision of food to the needy is an extension of . . . [their] religious communion service and is an ongoing representation of the communion . . . observed during the service." (Little Aff. ¶ 6.) And Bruckner, founder of Philly Restart, "live[s] . . . [his] faith" and "choose[s] to worship . . . through the act of providing food to the poor and homeless."  (Bruckner Aff. ¶¶ 3, 6); *see, e.g.*, *W. Presbyterian Church*, 862 F. Supp. at 546 ("Unquestionably, the Church's feeding program in every respect is religious activity and a form of worship.").

16.    It is plaintiffs' sincere and deeply-held belief that they are called by the teachings of Jesus Christ to serve the poor where the poor are found. Members of the King's Jubilee consider the area of the Parkway in front of Philadelphia Family Court "sacred ground for acts that seek to replicate the acts of Jesus Christ in providing sustenance to the poor and needy where they are found." (Coulter Aff. ¶ 5.) It is their belief that "[t]he needy and homeless sanctify this ground." (*Id*.) Congregants of the Welcome Church believe that the Parkway is "sacred ground for prayer and communion." (Little Aff. ¶ 6.) Furthermore, "this outdoor effort enables [the Welcome Church] to reach people for Christ [who] . . . cannot [be] reach[ed] indoors." (*Id*. ¶ 9.) Rev. Jenkins testified that he was called by God to the location where Chosen 300 Ministries conducts its program. (Jenkins Test.) And members of Chosen 3000 Ministries seek to serve the homeless as if they were serving Christ himself by serving the homeless where they are found. (*Id*.); *see, e.g.*, *Big Hart Ministries Ass'n v. City of Dallas*, No. 07-0216, 2011 U.S. Dist. LEXIS 128443, at *12

(N.D. Tex. Nov. 4, 2011) ("Plaintiffs' food sharing practices require them to seek out homeless people in the communities' streets and feed them.").

17.  Having concluded by clear and convincing evidence that plaintiffs' outdoor food-sharing programs are an "exercise of religion" under the PRFPA, I must now consider whether the ban substantially burdens this exercise.

### ii.  Substantial Burden

18.  Plaintiffs maintain that the ban is a substantial burden under the PRFPA because it "(1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs. (2) Significantly curtails a person's ability to express adherence to the person's religious faith. (3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion." *Id*. § 2403.

19.  To begin, the Third Circuit has observed that the PRFPA's "definition of 'substantially burden' appears to create some tension between state and federal law . . . [because] [t]he United States Supreme Court has cautioned against making religious interpretations in the First Amendment context." *Combs*, 540 F.3d at 258 (Scirica, C.J., concurring); *see, e.g.*, *Emp't Div. v. Smith*, 494 U.S. 872, 887 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."). However, the statutory definition of "substantial burden" appears to require me to examine plaintiffs' religious beliefs to some extent. *Combs*, 540 F.3d at 259 (Scirica, C.J., concurring). Nevertheless, I will endeavor to do so while bearing in mind the Court's admonishment that "[i]t is not within the judicial ken to question the centrality of particular beliefs or

36

practices to a faith, or the validity of particular litigants' interpretations of those creeds."

*Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

20. Section 110 of the regulations governing Fairmount Park prohibits "the distribution of food free of charge to the public, to groups of three or more people." (Pls.' Ex. J; DiBerardinis Test.) This applies "anywhere in the Fairmount Park system." (*Id.*) Because plaintiffs conduct their food-sharing program along the Parkway and because plaintiffs welcome not just their regular homeless congregants, but any needy persons, defendants maintain that plaintiffs' outdoor food-sharing programs fall within section 110 and are therefore banned. (DiBerardinis Test.)

21. While defendants are quick to point out that the regulation does not apply to private property or public property that is not a part of the Fairmount Park system, there is no open green space other than Fairmount Park anywhere near the Parkway. Defendants have banned plaintiffs from engaging in their religious food-sharing programs in 63 municipal parks that cover 9,200 acres of land. In effect, section 110 will terminate plaintiffs' long-standing religious practice of sharing food with the homeless outdoors.

22. I conclude by clear and convincing evidence that section 110 qualifies as a substantial burden under subsection (1) of the PRFPA. Subsection (1) defines a substantial burden as a municipal action that "[s]ignificantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs." *Id.* § 2403. Plaintiffs have established that their sincerely held religious beliefs mandate that they share food with the homeless where the homeless are found. A high concentration of homeless people living on the streets in Philadelphia live along the Parkway. Section 110 does not simply

37

constrain plaintiffs' distribution of free food to the homeless along the Parkway, conduct

mandated by plaintiffs' religions, it terminates that activity all together. There can be no

doubt that a regulation that completely prohibits an activity by definition "significantly

constrains or inhibits" that activity. Thus, section 110 is a substantial burden on plaintiffs'

free exercise of religion.[14]

_____

[14] Defendants argue that the ban is not a substantial burden under the PRFPA based on *Brown v. City of Pittsburgh*, 540 F.3d 263, 287 (3d. Cir. 2009). In *Brown*, the plaintiff challenged the validity of an ordinance that established "buffer" and "bubble" zones where picketing, demonstrating, and leafleting were regulated or proscribed, surrounding the entrances to hospitals, medical offices, and clinics. *Id*. 266. Among other things, the plaintiff claimed that the ordinance violated the free-speech and free-exercise clauses of First Amendment and the PRFPA. *Id*. The Third Circuit began by addressing the free-speech claim and concluded that each zone was facially valid on its own, but that in combination, the zones together were invalid. *Id*. at 273-76. Turning to the PRFPA claim, the court observed that:

> In this case, the exercise of religion at issue—Brown's advocacy activities in front of the clinics—is also expression protected by the First Amendment. . . . As we seek to determine what constitutes a substantial burden in this context, we confront two possibilities. First, 'substantially burden' might be defined such that the protection the [P]RFPA affords to religious speech is coextensive with (or lesser than) that afforded to speech generally by the First Amendment. . . . Second, 'substantially burden' might be defined such that the [P]RFPA would provide more protection to speech motivated by religious belief than the First Amendment would provide to that same speech. . . . This second definition of 'substantially burden' raises serious constitutional concerns because it would cause the applicability of the Ordinance to turn on whether a given advocacy activity was motivated by religious or non-religious beliefs.

*Id*. at 286. In order to avoid establishment-clause concerns, the court concluded that the PRFPA "confers on religiously motivated expression the same extent of protection provided by the First Amendment to expression generally." *Id*. at 287.

Defendants initially adopted the position that if plaintiffs' food-sharing programs are expressive conduct to passers by protected by the free-speech clause, then I "cannot accord greater protection to [p]laintiffs' religious expressive conduct than . . . non-religious expressive conduct." (Def. City of Phila.'s Supplemental Conclusions of Law at 3.) Subsequently, defendants appear to have abandoned this argument by offering to grant Rev. Little an exception from the ban for her communion service and by acknowledging that I "could certainly order [defendants], [mea] sponte, to grant such a limited exception under the [P]RFPA." (Defs.' Post-

23.     Defendants argue that because the ban "imposes no restrictions upon praying or preaching

        or reading the Gospel or engaging with the homeless in [Fairmount Park]," the ban does

        not burden plaintiffs' free exercise.[15] (Defs.' Post-Hearing Br. at 2-3.) What defendants

        fail to appreciate is that to plaintiffs, sharing food with the poor is as much a form of

        religious worship as is prayer, preaching, or reading the Bible.

24.     But defendants' argument is not persuasive for an additional and more fundamental

        reason. Essentially, defendants have assumed the authority to ascribe some of plaintiffs'

        religious activities more religious significance than others, irrespective of the significance

        that plaintiffs themselves ascribe to their own religious activities. Defendants compound

        this error by offering to grant Rev. Little a limited exception for the food and drink she

        uses during her Communion service, which they characterize as a "core component of a

        religious service," but not for the food Rev. Little shares with the homeless after the

        service despite the fact that Rev. Little considers this food an ongoing representation of

_____

Hearing Br. at 3.)

        While I think it wise not to reach plaintiffs' constitutional claims so early in the litigation,
I will note that the evidence at the hearing regarding whether plaintiffs' food-sharing programs
are a form of expressive conduct to passers by protected by the free-speech clause was so
insubstantial that I do not consider *Brown* to be a concern in this case. *See Tenafly*, 309 F.3d at
161 (explaining that when evaluating a claim that conduct is expressive and therefore protected
by the free-speech clause, a court must first examine whether a plaintiff subjectively intended his
conduct to communicate a message to observers and then must consider whether observers
understood the message the plaintiff intended to convey).

        [15] Defendants' reliance upon *Family Life Church v. City of Elgin*, 561 F. Supp. 2d 978,
987 (N.D. Ill. 2008), *Warner v. City of Boca Raton*, 887 So. 2d 1023 (Fla. 2004), and *Christian
Romany Church Ministries, Inc. v. Broward Cnty.*, 980 So. 2d 1164 (Fla. Dist. Ct. App. 2008) is
misplaced. Each case involved a religious freedom restoration or protection statute that did not
statutorily define a "substantial burden" and in each case the court adopted a stricter standard
than the standard prescribed by the PRFPA.

the Communion observed during the service. (Defs.' Post-Hearing Br. at 3; Little Test.) It

is no more appropriate for defendants to "presume to determine the place of a particular

belief in a religion" than it would be for me to do so. *Emp't Div.*, 494 U.S. at 887; *see*

*United States v. Lee*, 455 U.S. 252, 263 (1982) (Stevens, J., concurring) (observing that

there exists an "overriding interest in keeping the government—whether it be the

legislature or the courts—out of the business of evaluating the relative merits of differing

religious claims"); *see also Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707,

715-16 (1981) ("[T]he guarantee of free exercise is not limited to beliefs which are shared

by all of the members of a religious sect."); *Jesus Ctr.*, 215 Mich. App. at 67 ("It is

substantially burdensome to limit a church to activities and programs that are commonly

practiced by other churches rather than allowing it to follow its faith even in unique and

novel ways.").

25.     Plaintiffs also contend that the ban constitutes a substantial burden under subsection (3)

because it "[d]enies a person a reasonable opportunity to engage in activities which are

fundamental to the person's religion."[16] *Id*. § 2403. As stated above, plaintiffs have

demonstrated by clear and convincing evidence that sharing food with the homeless and

hungry is an act of worship and an act of charity that is fundamental to their religion.

Because the ban applies at all times in all 63 municipal parks that comprise the Fairmount

Park system, which includes the Parkway where defendants concede the homeless have

the right to live, and because most of the open green space in Philadelphia is part of

---

[16] Because the ban is a substantial burden under subsections (1) and (3) of the PRFPA, I
need not consider whether it is also a substantial burden under subsection (2).

Fairmount Park, the ban does not afford plaintiffs a reasonable opportunity to conduct their outdoor food-sharing programs.

26.    Defendants argue that the City Hall apron offers plaintiffs such a "reasonable opportunity." Plaintiffs maintain that this site is not a suitable alternative for their food-sharing programs for several reasons. First, it is difficult for some homeless to travel to the City Hall apron. The site is five blocks away from plaintiffs' current location on the Parkway and surrounded by four lanes of heavy traffic and intersections that are difficult to navigate, especially for disabled homeless individuals. This concern is only exacerbated by the fact that the City Hall apron is only open to plaintiffs on weekdays from 6:00 to 8:00 p.m. when traffic is often at its worst. Second, many homeless are afraid of government officials and police officers—yet defendants propose to bring them to the seat of City government. Defendants' decision to station additional security guards at the site during food-sharing programs magnifies the problem. Third, the City Hall apron is immediately adjacent to a large construction site and is therefore noisy, dirty, and dusty. The dust and debris blowing off the construction site make the City Hall apron inappropriate for serving or consuming food outdoors. Finally, plaintiffs point out that the City Hall apron is considerably more confining and less dignified than the Parkway. I agree with plaintiffs that all of these deficiencies make the City Hall apron an unsuitable alternative, which certainly does nothing to advance defendants' objective to feed the homeless indoors. I also find it significant that the site is only temporarily available. Mayor Nutter testified that he will close the City Hall apron within a year but he has not committed to a closing date and he may close the site sooner than that. When Mayor

41

Nutter does close the City Hall apron, plaintiffs will be left without any outdoor space in which to conduct their religious food-sharing programs.

27.    Defendants object that this is mere speculation because plaintiffs have not yet moved their food-sharing programs to the City Hall apron and therefore cannot know whether their homeless congregants will follow them.[17] However, members of Feeding 5000 have relocated their religious food-sharing program from the Parkway to the City Hall apron and their experience confirms that plaintiffs' concerns are justified. Like plaintiffs, Feeding 5000 is a religious organization that conducts food-sharing programs with the homeless as part of its religious observance. Since relocating to the City Hall apron, Feeding 5000 has seen its congregation shrink in size by more than half. But the changes to the congregation of Feeding 5000 go beyond just numbers. The homeless who do still attend the program at the City Hall apron take their food and leave in order to eat elsewhere or leave immediately after they have finished eating. This has undermined the ability of Feeding 5000's members to forge relationships with the homeless and to deliver religious and social services to the congregation. Such reductions in the number and

---

[17] Defendants argue that testimony about what the homeless may do if plaintiffs cannot serve food on the Parkway is hearsay. (Defs.' Post-Hearing Br. at 1.) However, "[i]t is well established that a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Kos Pharms., Inc. v. Andrx Corp*., 369 F.3d 700, 718 (3d Cir. 2004) (internal quotation marks omitted). The Third Circuit has instructed district courts to "exercise their discretion in weighing all the attendant factors, including the need for expedition, to assess whether, and to what extent, . . . hearsay materials are appropriate given the character and objectives of the injunctive proceeding." *Id*. at 719 (internal quotation marks omitted). To the extent that such testimony is hearsay, I will consider it anyway. The time-sensitive nature of this motion, the unique characteristics of the homeless that make obtaining their testimony unusually difficult, and the corroborative expert testimony of Sister Mary Scullion all counsel in favor of admitting this evidence.

quality of congregant relationships are inconsistent with the PRFPA. *Stuart Circle Parish v. Bd. of Zoning Appeals*, 946 F. Supp. 1225, 1238 (E.D. Va. 1996) (rejecting the defendants' argument that "no substantial burden exists in the present case because the City's zoning laws do not prevent the feeding of the homeless but merely restrict the number of persons whom may be fed").

28.  For all of these reasons, I conclude that the City Hall apron does not offer a "reasonable opportunity to engage in activities which are fundamental" to plaintiffs' religion. *Id*. § 2403.

29.  Alternatively, defendants argue that four private indoor facilities in Philadelphia have space to accommodate plaintiffs' food-sharing programs and thus offer plaintiffs a reasonable opportunity to engage in their religious activities. The evidence does not bear this out. Two of these facilities are already overwhelmed and turning away needy individuals. (Scullion Test.) Furthermore, a third facility, Broad Street Ministries, lacks the resources necessary to expand and is not a true alternative. (Kretsge Test.) At most, the evidence established that a single indoor facility located 7 blocks away from where plaintiffs conduct their food-sharing programs on the Parkway, Sunday Breakfast Rescue Mission, could serve more meals to the hungry and would be willing to work with the plaintiffs. (McMillen Test.)

30.  Sunday Breakfast Rescue Mission does not offer plaintiffs "a reasonable opportunity to engage in activities which are fundamental to the person's religion." The evidence has clearly established that some homeless and hungry will not or cannot go to indoor facilities for food-sharing programs. Sister Mary Scullion, an expert on homelessness,

43

testified that some homeless are resistant to going to indoor food-service programs for a variety of reasons: some do not want to leave their possessions unguarded on the Parkway; some have physical disabilities that make travel difficult; some have mental disabilities that make keeping track of time and place difficult; and some have auditory hallucinations that tell them not to go indoors. (Scullion Test.) The City has not yet committed the resources or preparation necessary to persuade these individuals to come indoors. (*Id.*)

31.   Plaintiffs' combined 56 years of experience in serving the homeless corroborates Sister Mary Scullion's testimony. Both Chosen 300 Ministries and the Welcome Church conduct indoor food-sharing programs in addition to their outdoor food-sharing programs. Rev. Jenkins and Rev. Little testified that while some individuals attend both, other individuals who attend the outdoor programs cannot or will not attend the indoor programs. (Jenkins Test.; Little Test.) Rev. Coulter testified that in addition to some portion of his homeless congregants who do not like or have been sickened by food at indoor facilities and will not go indoors, some of his congregants are not homeless but are hungry and will not go to indoor food-sharing programs because they do not want to take services away from the homeless. (Coulter Test.) Plaintiffs' sincere and deeply held beliefs compel them to reach the homeless who cannot be reached indoors for Christ. (Little Test.; Coulter Aff. ¶ 7.)

32.   In sum, plaintiffs have shown by clear and convincing evidence that the ban is a substantial burden because it "[s]ignificantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs" and because it "[d]enies a person

44

a reasonable opportunity to engage in activities which are fundamental to the person's religion." 71 Pa. Stat. Ann. § 2403.

### iii.    Compelling Government Interest and Least Restrictive Means

33.    The burden has therefore shifted to defendants to prove by a preponderance of the evidence, that the ban is "[i]n furtherance of a compelling interest of the agency" and is "[t]he least restrictive means of furthering the compelling interest." *Id.* § 2404.

34.    Defendants have advanced several justifications for the ban. First, Mayor Nutter believes the ban on outdoor food sharing in Fairmount Park is justified because it is undignified to make the hungry and homeless wait in line for food. (Nutter Test.) Human dignity is no doubt a compelling interest and plaintiffs do not argue otherwise. However, it is difficult to comprehend how, if at all, the ban advances this interest. The ban forces plaintiffs to relocate to the City Hall apron in the short term and to either abandon their food-sharing practices or move them indoors in the long term. Yet, defendants acknowledge that the homeless must also wait outdoors in lines to receive food at both the City Hall apron and indoor food-sharing facilities. (Nutter Test.) The City Hall apron is dirty, crowded, noisy, and considerably less dignified than the Parkway. And I am at a loss to understand how taking choice away from the homeless advances their dignity. Furthermore, defendants concede that some homeless will not go indoors and some will not go to the City Hall apron. (*Id.*) The ban will reduce these individuals to extreme hunger, panhandling, or trash picking—far less dignified alternatives than attending plaintiffs' outdoor food-sharing programs. Defendants have failed to show that the ban will advance the dignity of the homeless in any respect, much less that the ban is the least restrictive means of

45

accomplishing this goal.

35.    I am similarly unconvinced that the ban will advance defendants' interest in ending homelessness or in facilitating the attendance of homeless at indoor food-sharing programs. Both are compelling and important interests and I do not doubt that all of the parties in this case care deeply about the plight of the homeless. However, defendants have offered no evidence that banning plaintiffs' outdoor food-sharing programs on the Parkway will help accomplish either goal, much less a preponderance of such evidence. All defendants' ban accomplishes at present is the relocation of outdoor food sharing to the City Hall apron—a relocation that makes it more difficult for the homeless to access the food, religious services, and social services that plaintiffs offer. Perhaps by the trial date, defendants will have been able to formulate a program that effectively persuades the homeless to come indoors to eat, or better yet, a program that moves toward ending homelessness, as is their ultimate objective. However, no evidence was presented of any current efforts to do so or any manner in which the ban contributes to such objectives.

36.    Defendants also maintain that they have an interest in providing social services for the homeless. The evidence has shown that the homeless suffer from mental illness, physical disabilities, drug and alcohol dependence, and hunger, among other things. The City spends over $100 million annually on services for the homeless. Clearly, defendants have a compelling interest in ensuring that the homeless have access to these services. But defendants have not shown that the ban is the least restrictive means of furthering this interest. Defendants could accomplish their goal by offering social services to the homeless on the Parkway without burdening plaintiffs' religious activities. Defendants

46

have offered no explanation for why they could not take this approach and I can think of

none. Furthermore, because defendants do not actually offer any social services at the

City Hall apron, it is hard to imagine how defendants' solution advances their interest at

all. In fact, the evidence has demonstrated that relocating to the City Hall apron

undermines plaintiffs' ability to provide valuable social services to the homeless because

the homeless do not linger at the City Hall apron after they have finished eating and do

not develop the relationships necessary to successfully connect them to social services.

37.   Finally, defendants attempt to justify the ban on the ground that it is necessary to curb the

litter and trash generated by plaintiffs' outdoor food-sharing programs. While the

evidence has established that trash, litter, and human waste are a legitimate concern, it is

not clear that this rises to the level of a compelling interest. *Compare Schneider v. State*,

308 U.S. 147, 162 (1939) ("[T]he purpose to keep the streets clean and of good

appearance is insufficient to justify an ordinance which prohibits a person rightfully on a

public street from handing literature to one willing to receive it."); *and Pottinger v.*

*Miami*, 810 F. Supp. 1551, 1581 (S.D. Fla. 1992) ("The City has a legitimate interest in

having aesthetically pleasing parks and streets and in maintaining facilities in public

areas. However, this interest is not compelling, especially in light of the necessity of

homeless persons to be in some public place when no shelter is available." ); *with Horina*

*v. City of Granite City*, 538 F.3d 624, 633 (7th Cir. 2008) ("We have no quarrel with

Granite City's claim that the prevention of litter, intrusion, trespass, and harassment is a

substantial government interest."). Assuming that it does, the ban is still not the least

restrictive means of accomplishing this objective. Defendants could enforce existing laws

against litter and public urination and defecation, *Schneider*, 308 U.S. at 162 ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets."), or they could provide portable restrooms and trash compactors at the sites along the Parkway where plaintiffs conduct their programs. Defendants could provide additional maintenance staff during the food-sharing program, like they do at the City Hall apron, or defendants could perform an additional garbage-collection service after the programs, as they have for Chosen 300 Ministries since 2003. All of these would be less restrictive means of curbing litter and human waste than banning plaintiffs' outdoor food-sharing programs from all of Fairmount Park.

38.   There is some evidence that the true purpose behind the ban is to move plaintiffs' activities away from the many cultural attractions along the Parkway in an effort to hide the City's homeless population away from tourist eyes. Defendants vehemently deny this and do not attempt to defend the ban on this ground. Nor could they, as discriminating against unpopular groups is not a legitimate government purpose, let alone a compelling one. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) ("We have consistently held, however, that some objectives, such as 'a bare . . . desire to harm a politically unpopular group,' are not legitimate state interests."); *Romer v. Evans*, 517 U.S. 620, 634 (1996) (reasoning that animosity toward homosexuals is not a legitimate governmental interest); *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 448 (1985) (concluding that "mere negative attitudes, or fear" of the mentally retarded are not legitimate state interests); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (holding that the purpose to discriminate against "hippies" is not itself a legitimate interest).

48

39.     I conclude by clear and convincing evidence that the ban on sharing food free of charge

with three or more members of the public in Fairmount Park substantially burdens

plaintiffs' free exercise of religion and that defendants have failed to show by a

preponderance of the evidence that the ban is the least restrictive means of furthering

their objectives of ending homelessness, feeding the homeless indoors, providing social

services to the homeless, increasing the dignity of the homeless, or reducing the trash

burden along the Parkway. Therefore, plaintiffs have shown a reasonable likelihood of

success on the merits of the PRFPA claim.[18]

### C.     Irreparable Injury

40.     In addition to demonstrating a reasonable likelihood that they will prevail on the merits of

their claim, plaintiffs must also show "that they are likely to suffer irreparable injury

without relief" in order to obtain a preliminary injunction. *Tenafly*, 309 F.3d at 157.

41.     "In general, to show irreparable harm a plaintiff must demonstrate potential harm which

cannot be redressed by a legal or an equitable remedy following a trial."[19] *Acierno v. New*

---

[18] The parties do not discuss whether the challenge to the ban is facial or as applied. While I am aware that there are other groups conducting food-sharing programs on the Parkway, I do not know what the religious beliefs of these groups are or whether these groups could prevail on a PRFPA claim as plaintiffs have shown they likely will. Accordingly, I construe plaintiffs' challenge to be as applied and grant injunctive relief as to plaintiffs only.

[19] Plaintiffs have failed entirely to demonstrate that the health regulations will cause them any harm, much less irreparable harm. All of the plaintiffs testified that they are currently complying with the health regulations and that they will continue to comply with them. The regulations require one person from each outdoor food-sharing program to complete a free two-hour food-safety course and pass a test at the end of the course. (Pls.' Ex. K.) All 34 individuals who have taken the course have passed the test. (Kretsge Test.) The regulations also require servers to wear gloves, to comply with certain food preparation and transportation requirements, and to provide temporary hand-washing stations which can be any container that water flows freely out of, such as a cooler. The regulations require each program to submit a short application

*Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks omitted).

42.    However, the Third Circuit has stated that "[l]imitations on the free exercise of religion

inflict irreparable injury." *Tenafly*, 309 F.3d at 178, because "[t]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Although I only reach

plaintiffs' statutory free-exercise claim and not their constitutional free-exercise claim,

the denial of plaintiffs' statutory free-exercise rights is also a harm that cannot be

redressed following the final adjudication. *O Centro Espirita Beneficiente Uniao Do*

*Vegetal v. Ashcroft*, 342 F.3d 1170, 1187 (10th Cir. 2003) ("[A] plaintiff satisfies the

irreparable harm analysis by alleging a violation of [the Religious Freedom Restoration

Act]."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]irreparable harm

accompanies a substantial burden on an individual's rights to the free exercise of religion

under [the Religious Freedom Restoration Act].").

43.    Defendants argue there is no "presently existing actual threat" to plaintiffs sufficient to

constitute irreparable injury because the City Hall apron and indoor food-sharing facilities

offer plaintiffs ample alternative locations for their programs. *Adams v. Freedom Forge*

---

for a free annual permit that is processed in approximately 10 days. The Health Department has
carefully crafted these regulations so that they impose only a minimal burden on plaintiffs. Given
this evidence, I am at a loss to identify any threat of harm to plaintiffs.

Plaintiffs believe that they are being singled out inappropriately because the health
regulations do not apply to such comparable activities as picnics, family reunions, and business
outings. However, the evidence has shown that these groups are not as similarly situated to
plaintiffs' programs as plaintiffs would have me believe. The homeless have an elevated risk of
contracting food-borne illness because of higher rates of malnutrition, alcoholism, and chronic
illness, a risk that may be as much as 25 times higher than that of healthy individuals. Given this
disparity, the Health Department's minimally burdensome regulations seem prudent, not
inappropriate or discriminatory.

*Corp.*, 204 F.3d 475, 487 (3d Cir. 2000). As explained above, these "alternative" locations are not true alternatives. Thus, the ban does pose a "presently existing actual threat" to plaintiffs' free exercise of religion.

### D.    Harm to Non-Moving Party If Injunction is Granted

44.    Next, I must consider whether the hardship defendants will suffer if relief is granted is greater than the hardship plaintiffs will suffer if relief is denied. *Tenafly*, 309 F.3d at 157.

45.    Defendants claim that an injunction would harm their ability to establish and enforce regulatory procedures governing the maintenance of Fairmount Park. In support of this proposition, defendants cite *Lady Liberty Transp. Co. v. Phila. Parking Auth.*, No. 05-1322, 2006 U.S. Dist. LEXIS 3857, at *9 (E.D. Pa. Feb. 2, 2006) and *Stanley v. Luzerne County Dist. Attys. Office*, No. 11-1699, 2011 U.S. Dist. LEXIS 132169, at *19 (M.D. Pa. Sept. 26, 2011). Both cases are readily distinguishable. First, although the court in *Lady Liberty* did observe that the defendants had an interest in the ongoing regulation of a highly regulated industry, the court ultimately denied the plaintiffs' motion for a preliminary injunction because the plaintiffs had failed to establish any irreparable injury—not because the harm to the defendants' regulatory interest was a greater than the harm to plaintiffs. *Id.* at *9. Second, given the Eleventh Amendment and federalism concerns raised by the plaintiff's request for an injunction against a pending state criminal proceedings in *Stanley*, the court's observation of "the public's interest in permitting the state legal process to move forward" is hardly relevant to the case before me.

46.    A preliminary injunction will not cause defendants serious injury—it will merely restore the status quo that has existed for more than two decades. *Accord Stuart Circle Parish,*

946 F. Supp. at 1236. In light of the irreparable injury that plaintiffs will suffer if they are

denied injunctive relief, the balance of hardships clearly favors granting the preliminary

injunction. *See Tenafly*, 309 F.3d at 178 ("Without an injunction, on the other hand, the

plaintiffs' free exercise of religion will be impaired. The balance easily tips in the

plaintiffs' favor.").

### E.    Public Interest

47.    Finally, I must address whether "granting relief would serve the public interest." *Id*. at

157.

48.    "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the

merits and irreparable injury, it almost always will be the case that the public interest will

favor the plaintiff." *AT & T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d

Cir. 1994). And in reality, this case is no exception. While defendants are correct that the

public has an interest in the orderly and sanitary maintenance of Fairmount Park, the

Parks Department has successfully safeguarded that interest for more than two decades

while allowing plaintiffs to conduct their religious food-sharing programs.

49.    There is a strong public interest in protecting the free exercise of religion, whether this

protection derives from a legislative enactment, *O Centro Espirita Beneficente Uniao do

Vegetal v. Ashcroft*, 389 F.3d 973, 1010 (10th Cir. 2004) ("[P]ursuant to RFRA, there is a

strong public interest in the free exercise of religion."), *aff'd* 546 U.S. 418 (2006), or a

constitutional amendment, *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d

1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of

a party's constitutional rights.").

50.     It hardly needs to be said that plaintiffs' food-sharing programs benefit the public interest. Despite defendants' considerable efforts, many Philadelphians remain homeless and hungry. The governmental and private programs that minister to needy Philadelphians are largely overwhelmed and clearly insufficient to meet all their needs. To impede plaintiffs' efforts can only harm the public interest.

## III.     Conclusion

The City's regulation states that "[n]o person, group, or organization may engage in Outdoor Public Serving of Food anywhere in the Fairmount Park system." Outdoor public serving of food is defined to mean the distribution of food free of charge to three or more members of the public, but does not include the distribution of food as part of a special event approved by the City. The City interprets this ban to exclude known groups such as family members, groups of school children, and Girl Scout troops from its definition of "members of the public," so long as the known groups have a relationship that extends beyond sharing food outdoors.

The PRFPA prohibits a municipal agency from substantially burdening a person's free exercise of religion except where the agency proves that the burden is both in furtherance of a compelling interest of the agency and the least restrictive means of furthering that compelling interest.

A substantial burden is an agency action that significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs or that denies a person a reasonable opportunity to engage in activities that are fundamental to the person's religion.

Plaintiffs engage in food sharing with the homeless and hungry on the Parkway as a form

53

of religious worship. Defendants do not contest the sincerity of plaintiffs' religious beliefs and purposes. Defendants also do not contest the right of the homeless to live on the Parkway.

Defendants have banned plaintiffs from engaging in their religious food-sharing programs in 63 municipal parks that cover 9,200 acres of land under the Fairmount Park System, which includes the Parkway. In effect, the ban terminates plaintiffs' longstanding religious practice of sharing food with the homeless outdoors and is therefore a substantial burden under PRFPA because it significantly constrains or inhibits conduct or expression mandated by plaintiffs' sincerely held religious beliefs. Likewise, the ban denies plaintiffs a reasonable opportunity to engage in activities that are fundamental to plaintiffs' religion.

Defendants contend that the ban is justified because it is undignified to make the hungry and homeless wait in line for food on the Parkway. However, the ban does not advance this governmental interest. Defendants acknowledge that the homeless must also wait outdoors in lines to receive food at both the City Hall apron and indoor food-sharing facilities.

Likewise, there is no evidence that the ban would advance the governmental interest in ending homelessness or in facilitating the attendance of the homeless at indoor food-sharing programs. In addition, the ban does not advance the governmental interest in providing social services for the homeless since those services could be provided on the Parkway and there is no evidence that they are being provided at the City Hall apron. The temporary use of the City Hall apron is not a suitable alternative for the food-sharing programs and does nothing to advance the City's objective of moving food sharing with the homeless indoors.

Sister Mary Scullion, plaintiffs' expert, testified that it is possible to work with the homeless over time to get them to come indoors, but the City has not yet committed the resources

54

or preparation necessary to achieve this.

Many of the homeless resist going indoors so the City needs time and a program to persuade those homeless to eat at indoor locations and there is no evidence at this stage of the litigation that such a program exists.

Defendants have failed to show by a preponderance of the evidence that the ban is the least restrictive means of furthering their objectives of ending homelessness, feeding the homeless indoors, providing social services to the homeless, increasing the dignity of the homeless, or reducing the trash burden along the Parkway. Therefore, plaintiffs have shown a reasonable likelihood of success on the merits of the PRFPA claim.

The limitations on the free exercise of religion by plaintiffs inflict irreparable injury.

A preliminary injunction will not cause defendants serious injury. It merely restores the status quo that has existed for more than two decades. That hardship is clearly not greater than the hardship plaintiffs will suffer if the ban is enforced. Finally, there is a strong public interest in protecting the free exercise of religion. Plaintiffs' food-sharing programs benefit the public interest.

While this case has drawn national attention and caused considerable controversy at the local level, it is my sincere hope that the parties will move forward in the spirit of collaboration in order to work together toward their common goal—ending homelessness and hunger in the City of Philadelphia. In the meantime, I will grant plaintiffs' motion for a preliminary injunction with respect to the Parks Department regulation but deny plaintiffs' motion with respect to the Health Department regulations. An appropriate order follows.